UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BARTON SOLAR, LLC,　　　　　　　)
　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　)　　　Case No: 5:21-cv-25
　　　　　　　　　　　　　　　　)
RBI SOLAR, INC.,　　　　　　　　)
　　　　Defendant.　　　　　　　　)

## ORDER ON RBI SOLAR, INC.'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT
(Doc. 105)

### Introduction

Defendant RBI Solar, Inc. ("RBI") moves for partial summary judgment under Federal Rule of Civil Procedure 56 and Local Rule 56. (Doc. 105.) Specifically, RBI moves for summary judgment as to Count II (Breach of Express Contract for Indemnification), Count VII (Fraudulent Inducement), and Count VIII (Fraudulent Concealment). RBI does not move for summary judgment as to Count III (Breach of Contract). RBI also requests the court to find as a matter of law that Plaintiff Barton Solar, LLC ("Barton") is not entitled to any future damages, including for lost revenue or future repairs to the solar array that is the subject of this litigation. Barton opposes this motion. (Doc. 112.) A hearing on pending motions was held on January 6, 2025, after which the court took the motions under advisement. (*See generally* Doc. 147.)

RBI is represented by Brian J. Sullivan, Esq., Daniel A. Seff, Esq., and Jesse R. Lipcius, Esq. Barton is represented by Andrew J. Snow, Esq., Michael F. Hanley, Esq., Paul J. Perkins, Esq., and Ronald W. Dunbar, Jr., Esq.

## Evidentiary Objections

Before discussing the merits of RBI's Motion for Partial Summary Judgment, the court addresses several objections to declarations submitted by Barton to oppose summary judgment. RBI asserts the court should not consider these declarations because they contain inadmissible hearsay and attempt to create "sham issue[s] of fact." (Doc. 118 at 1–2.)

An affidavit or declaration used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Affidavits do not create a genuine issue of material fact if they contain inadmissible hearsay or merely rely on conclusory assertions. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004). A court may "strike portions of an affidavit that are not based on the affiant's personal knowledge, contain inadmissible hearsay, or make generalized and conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000) (citing *United States v. Priv. Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995).

Courts reviewing summary judgment motions "generally should not weigh evidence or assess the credibility of witnesses." *See Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (citation modified). In "the rare circumstance" when a nonmoving party relies "almost exclusively on [their] own testimony, much of which is contradictory and incomplete, to establish a triable issue of fact, it may well be impossible for the court to determine whether the jury could reasonably find for" the nonmoving party, "and thus whether there are any 'genuine' issues of material fact, without making some assessment of" the nonmoving party's account. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 86 (2d Cir. 2019) (citation modified). In this situation,

courts must identify more than record ambiguity or incompleteness to conclude a party's testimony could not raise a genuine issue of fact. *Id.* "Later testimony [should not be disregarded] because an earlier account was ambiguous, confusing, or simply incomplete." *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 (2d Cir. 2013) (citation modified). Instead, the contradictions with the party's testimony must be "inescapable and unequivocal" for the court to find the testimony raises only "a sham issue of fact." *Bentley*, 935 F.3d at 86 (quoting *Fosamax Prods. Liab. Litig.*, 707 F.3d at 194).

*Declaration of Brian Browning*

RBI asks the Court to strike the declaration of Brian Browning for lack of personal knowledge, impermissible hearsay, and because the declaration contradicts Mr. Browning's testimony at a deposition and thus attempts to create a sham issue of fact. (Doc. 118 at 2.) RBI contends Mr. Browning cannot have personal knowledge of whether the racking posts have moved upwards out of the ground and damaged the electrical system because he testified at his deposition that he did not investigate the racking movement and only knows about any movement from conversations with Barton management or Krebs & Lansing Consulting Engineers ("K&L"). (*See id.*)

Mr. Browning's assertions in paragraph three of his declaration are impermissible hearsay under Federal Rule of Evidence 801 because Mr. Grant or Mr. Jewkes made those statements to Mr. Browning, and Barton offers those statements to prove their truth. *See Patterson*, 375 F.3d at 220–21 (holding that affidavit's hearsay assertion made in opposition to summary judgment, which would be inadmissible at trial, was insufficient to create genuine issue for trial). Paragraph four and the K&L report attached to the Browning Declaration are also impermissible hearsay for the

3

same reason. The remaining paragraphs of the Browning Declaration contain admissible testimony which may properly be considered in deciding the motion for partial summary judgment.

The court need not strike paragraphs three and four. Instead, the court will disregard any inadmissible content in its consideration of the summary judgment motion. *See, e.g.*, *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 434 n.3 (E.D.N.Y. 2013) (denying motion to strike on summary judgment and instead disregarding portions of affidavit that were not based on personal knowledge); *Flaherty v. Filardi*, No. 03 Civ. 2167(LTS)(HBP)., 2007 WL 163112, at *4 (S.D.N.Y. Jan. 24, 2007) (stating that, in response to a motion to strike, a court may instead "decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible" (citation modified)); *Ross Univ. Sch. of Med., Ltd. v. Brooklyn–Queens Health Care, Inc.*, No. 09-CV-1410(KAM)., 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) ("[C]ourts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions."), *report and recommendation adopted in relevant part*, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013); *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("[R]ather than scrutinizing each line . . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . . ., the Court, in its analysis of the motion for summary judgment, will only consider relevant evidence that is admissible. . . ."). RBI's request to strike the Browning Declaration is denied.

*Declaration of Ian Jewkes*

RBI asks the Court to strike the declaration of Mr. Jewkes because it allegedly contradicts Mr. Jewkes's earlier deposition testimony during which he stated it is possible the racking post movement has stabilized and that the movement seems to have slowed down recently. (Doc. 118 at 3); (Doc. 105-9 at 7, 31:13–19.) The Jewkes Declaration states that K&L took measurements

of the posts at the Project site each winter from 2018 to 2023 and these measurements "show steady movement up of the racking posts." (Doc. 112-13 ¶ 23.) Both statements can be simultaneously true, and they do not contradict one another. It is possible the reports demonstrate steady upward movement. It is also possible that, since the K&L report, the racking post movement has stabilized.

RBI also attempts to argue Mr. Jewkes cannot stand behind the post measurements with a reasonable degree of engineering certainty. (Doc. 118 at 3.) The deposition testimony does not support this assertion. Instead, Mr. Jewkes testified any conclusions about how much the posts have moved since construction concluded in 2015 must be estimates—not that he cannot stand behind the 2018–2023 measurements with a reasonable degree of engineering certainty. (Doc. 105-9 at 11, 51:12–19.) The court does not find any inescapable and unequivocal contradictions. *See Bentley*, 935 F.3d at 86. The court denies RBI's request to strike the Jewkes Declaration.

*Declaration of Robert Grant*

Finally, RBI asks the court to strike the declaration of Robert Grant on the basis that it contains hearsay, lacks authentication, presents opinions of undisclosed experts, and contradicts Mr. Grant's deposition testimony. (*See* Doc. 118 at 3–4.) The court agrees the Grant Declaration contains hearsay statements in violation of Federal Rule of Evidence 801. As a result, the court will not consider paragraphs five, eight and eleven of the Grant Declaration. *See Patterson*, 375 F.3d at 220–21.

The Grant Declaration, however, does not contain inescapable and unequivocal contradictions with the record. RBI contends that paragraph twenty-eight of this declaration cannot provide an estimated total remediation cost—including a total Project reconstruction, lost revenue, and previous repairs—of $4,000,000, because Mr. Grant allegedly testified that it would be impossible to determine what a full Project reconstruction would cost without an approved

5

reconstruction proposal from the Vermont Agency of Natural Resources ("ANR"). (*See* Doc. 118 at 4.) This is not a precise summary of Mr. Grant's testimony, however. Mr. Grant testified at his deposition that although Barton could not know the cost "definitively" until after ANR approval, it would be possible to get a "ball park" estimate of the total reconstruction cost. (*See* Doc. 105-5 at 9, 66:17–69:17.) Mr. Grant's deposition testimony and the Grant Declaration are consistent: Barton could estimate the cost of a full Project reconstruction, and Mr. Grant incorporated that number into his estimate of the total remediation cost. The record contains evidence of the cost of past and future repairs, and Mr. Grant, as manager of Barton, can testify to lost revenue. (*See* Doc. 112-14 ¶¶ 12–13, 15–16, 23, 27; Doc. 112-2.)

The court will not consider paragraphs five, eight, or eleven because they contain inadmissible hearsay. The court will consider the remaining paragraphs of the Grant Declaration. The court denies RBI's request to strike the Grant Declaration.

## Factual Background

The following facts are taken from the parties' summary judgment submissions and the record. This statement of facts resolves all ambiguities and draws all factual inferences in Barton's favor. *See Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015).

The Barton Solar Project is a solar electric generation facility located in Barton, Vermont. (Doc. 112-10, ¶ 1.) It is owned and operated by Barton. (Doc. 42, ¶ 1.) RBI is an Ohio company specializing in the design, manufacture, and installation of custom racking systems. (*Id.* ¶¶ 2, 7.)

On July 21, 2014, RBI entered into a contract with Barton ("the Contract") to design, engineer, manufacture, and install a racking system and solar panels for a solar array in Barton, Vermont (collectively, the "Project"). (*See* Doc. 112-10, ¶¶ 1, 4, 7; Doc. 105-4.) RBI was not contracted to perform, nor did it perform, electrical, excavation, backfill, or site maintenance work

for the Project. (Doc. 112-10, ¶¶ 5, 6, 21.) The purpose of the Project is to produce electric power. (*Id.* ¶ 3.)

RBI completed installation of the racking system and solar panels in 2015. The racking system for the panels was secured by embedding the foundational posts of the system into the ground. No measurements of how deeply the posts were embedded in the ground were taken at that time. (*See id.* ¶¶ 7, 19.)

In January 2016, Barton experienced electrical outage issues in its solar panels, which it contends resulted from vertical movement in the racking posts caused by frost heave. (*Id.* ¶¶ 7–9.) Frost heave occurs when water seeps into the ground and freezes, causing the ground to move upward. (*Id.* ¶ 10; *see also* Doc. 119-1 at 4.)

On October 27, 2016, K&L, the civil site engineer for the Project, inspected the Project to investigate the ongoing electrical issues. (Doc. 112-13, ¶¶ 3–5.) K&L marked the portion of the electrical conduit attached to the racking posts, in addition to the posts themselves, so K&L could determine at a future date whether any upward movement of the conduit or the racking posts had occurred. (*Id.* ¶¶ 4–7.)

K&L returned to the Project on April 20, 2017 to remeasure the markings and determined upward movement had indeed occurred. (*Id.* ¶ 7.) K&L visited the site again on May 16, 2018 and discovered the embedded posts continued to move. (*Id.* ¶¶ 8–9.)

Barton maintains RBI inadequately designed the Project by not accounting for the force of the frost heave in its design calculations. (*See, e.g.*, Doc. 112-1 at 5.) According to Barton, RBI should have performed a full geotechnical analysis of the ground beneath the Project before designing the foundation. (*See id.*) Barton further contends RBI misrepresented to Barton that it would perform a geotechnical analysis for the Project to persuade Barton to sign the Contract. In

deposition testimony, Robert Grant, the principal owner of Barton, stated that RBI misrepresented that its design was based on a full understanding of the subsurface conditions:

> I think the concept that they were going to do whatever physical investigation was necessary in order to adequately design a racking system that was specific to that site including representations in the contract about having been to the site, examin[ing] the physical conditions, being comfortable with the site characteristics and the impacts on their design, representing that they had -- that they were entering into the contract taking full, you know, ownership, for lack of a better term, of the site conditions in their design.

(Doc. 105-5 at 13, 104:17–105:3.)

The Project site is environmentally protected due to its status as a wetland and the presence of an endangered plant species, known as Marsh Horsetail. (Doc. 112-10 ¶ 37.) As a result, construction activities, including any work or remediation involving digging, require additional permitting and approval from the ANR. (*See id.* ¶¶ 37, 39, 40.) Barton does not have an ANR-approved proposal to repair the Project. (*Id.* ¶ 42.)

The parties disagree over RBI's responsibility for damage to the Project. Barton asserts the damage is covered by the contract's warranty provision and that full reconstruction of the Project is needed for the Project to operate as intended. (Doc. 42, ¶ 42; *see also* Doc. 112-10, ¶ 38.) Barton predicts the full reconstruction will cost $1,546,225.00 in labor and approximately $400,000 in materials and freight. (Doc. 112-10 ¶ 29; Doc. 112-2.) Barton also estimates that the Project must shut down for approximately one year for reconstruction, costing Barton approximately $700,000 in revenue. (*See* Doc. 112-12 ¶ 6; Doc. 112-14 ¶¶ 23, 27.) RBI disputes the extent of the damage and how much damage is covered by the warranty. (Doc. 64, ¶¶ 47–52.)

## Legal Standard

The court must grant a motion for summary judgment if the moving party demonstrates there is no genuine dispute as to any material fact and the moving party is entitled to judgment as

a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A dispute of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 39–40 (quoting *Anderson*, 477 U.S. at 248).

At the summary judgment stage, the function of the judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the moving party has carried its burden, the nonmoving party must produce sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249.  "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'"  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  When reviewing the evidence to determine whether summary judgment is appropriate, "the court must draw all reasonable inferences in favor of the nonmoving party, even though contrary inferences might reasonably be drawn."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation modified).  The court "may not properly consider the record in piecemeal fashion" but must review the record as a whole, disregarding all evidence favorable to the moving party that the jury is not required to believe.  *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (citation modified).

**I.      Barton's claim for breach of express contract for indemnification (Count II) survives summary judgment because a reasonable jury could find RBI's faulty design caused damage to electrical components covered by the indemnification clause.**

RBI contends Count II, Breach of Express Contract for Indemnification, fails as a matter of law because the indemnification provision of the Contract excludes damage to the "Work Itself." (Doc. 105 at 7–8.)   According to RBI, only the alleged damage to the Project's electrical components could conceivably trigger the indemnification provision, and Barton has no evidence of the extent of the electrical damage or that RBI caused the damage.  (*Id.* at 7–9.)  Barton counters that a report of its geotechnical engineering expert, Dr. Shawn P. Kelley, creates a genuine dispute of material fact regarding whether the racking post movement has damaged the Project's electrical components.  (Doc. 112 at 19–20.)

The Contract's indemnification clause provides that RBI must indemnify Barton from all costs "arising out of or relating to the performance of the Work, provided that any such . . . cost . . . is attributable to . . . injury to or destruction of tangible property (other than the Work itself)."[1]  (Doc. 105-4 at 60.)  The Contract defines "Work" as "[t]he entire construction or the various separately identifiable parts thereof required to be provided under the Contract Documents."  (*Id.* at 31.)  The Contract incorporates the Scope of Work for Racking and Module

---

[1] The complete clause states:

> To the fullest extent permitted by laws and regulations, Contractor shall indemnify and hold harmless Owner and Engineer, and the officers, directors, members, partners, employees, agents, consultants and subcontractors of each and any of them from and against all claims, costs, losses, and damage (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) arising out of or relating to the performance of the Work, provided that any such claim, cost, loss, or damage is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself), including the loss of use resulting therefrom but only to the extent caused by any negligent act or omission of Contractor, any subcontractor, any Supplier, or any individual or entity directly or indirectly employed by any of them to perform any of the Work or anyone for whose acts any of them may be liable.

(Doc. 105-4 at 60.)

10

Installation ("RI") Contractor dated July 15, 2014, which describes the RI Contractor's responsibilities as "the design, fabrication, and installation of a fix tilt, ground mounted, post driven racking system, and . . . the installation of all modules thereon." (*Id.* at 2, 10.)

Because RBI acknowledges the Project's electrical components fall outside the scope of the "Work" and that its indemnification obligations may therefore apply to the alleged damage, the primary disagreement is whether Barton has sufficient evidence that RBI caused any damage to the electrical components. (Doc. 105 at 8.) RBI contends that Dr. Kelley, Barton's expert witness, does not know whether racking post movement damaged the Project's electrical components. (*Id.* at 8–9.) Moreover, RBI asserts any responsibility for the damaged conduit attributed to RBI is rooted in speculation, highlighting other potential causes of the alleged damage. (*See id.*) Barton disagrees, arguing that Dr. Kelley's report establishes to a reasonable degree of engineering certainty that heaving has damaged the electrical conduit. (Doc. 112 at 19–20.)

The court finds that Barton has shown a genuine dispute regarding the extent and cause of damage to the Project's electrical components. In his report, Dr. Kelley opined that the soils at the Project site are frost susceptible and are the most likely cause of the vertical movement of the "I-beam" posts, which are a component of the driven piles. (Doc. 112-1 at 3, 315; *see also* Docs. 112-3 at 27:6–8; 112-1 at 91; 112-9 at 2.) Dr. Kelley also indicated these movements resulted in significant damage to the equipment—including modules, combiners, and recombiners—attached to the solar racking posts. (Doc. 112-1 at 5.) Dr. Kelley's report states that RBI's design calculations did not contain any reference to the force generated by frost heave, which, in his opinion, would explain the magnitude of heaving experienced at the Project site. (*Id.* at 3.)

RBI contends other potential causes of the alleged damage prevent Barton from demonstrating a causal connection between RBI's work and the damage to the electrical components. (Doc. 118 at 10.) RBI argues that Dr. Kelley cannot infer RBI's design caused the damage to the electrical components because he does not know if the damage was caused by trench settlement or racking post movement. (*See* Doc. 105 at 8–9.)

The project drawings created by RBI stipulate that the geotechnical engineer, JA McDonald, Inc. ("JA McDonald"), ensure "95% standard proctor density compaction levels within three feet of all racking posts, with compaction testing to confirm the same." (Doc. 112-10, ¶ 12.) In February 2016, Barton made a warranty claim against JA McDonald for excessive trench settlement and asked JA McDonald to return to the Project site to fill areas around combiner boxes and recompact all material to eliminate water pooling and freezing at the base of the conduit. (*Id.* ¶ 15; *see also* Doc. 105-8 at 2.) RBI claims the pooling of water from trench settlement may be causing the damage Barton is attributing to frost heaving. (Doc. 105 at 8–9.) Mr. Jewkes admitted it is possible that pooling around the electrical components and racking posts is an issue at the Project site and it is possible pooling would contribute to the damage to the electrical conduit and racking posts. (Doc. 112-10 ¶¶ 25–26; *see also* Doc. 105-9 at 10, 48:4–17.) RBI also highlights the statement made by Frederick Myrick of Peck Electric, the electrical engineer for the Project, indicating the presence of frozen or pooling water encompassing the electrical components and conduit at the Project site could potentially cause damage. (Doc. 105-12 at 9, 61:15–25.)

The court is not persuaded by RBI's argument for two reasons. First, the Court must disregard these alternative explanations for the electrical damage on summary judgment because a jury would not be required to believe testimony in favor of RBI. *See Kaytor*, 609 F.3d at 545. Second, the testimony RBI cites also contains evidence the racking post movement did, in fact,

cause the damage to the electrical components.  While Mr. Jewkes opined that pooling and freezing of water around the conduit could theoretically cause damage, he did not recall seeing such damage on the Project site.  (Doc. 112-10 ¶¶ 25–26; *see also* Doc. 105-9 at 10, 48:18–49:1.)  Mr. Myrick also stated in his deposition that water consistently pooling and freezing should not cause damage to the conduit itself.  (Doc. 105-12 at 7, 46:12–16; *see also id.* at 8, 56:9–11.)  While Dr. Kelley stated that pooling around electrical components may have played a part in the damage to the conduit, he also noted that the water below grade is causing the majority of the damage.  (Doc. 105-3 at 7, 54:22–56:21.)  Viewing all evidence in the light most favorable to Barton, a genuine dispute exists as to whether flaws in RBI's design caused damage to the Project's electrical components.

Barton has successfully demonstrated that a reasonable jury could find the electrical conduit was damaged due to frost heaving of the RBI-installed racking system, thus causing damage outside the scope of the "Work Itself."  The electrical conduit is not part of the "Work Itself" as referenced in the indemnification provision of the contract.  Therefore, Barton's indemnification claim withstands RBI's Motion, and summary judgment on Count II is DENIED.

## II.    **Barton's request for future damages survives summary judgment because RBI has not shown that the alleged costs of repair or lost profits are speculative.**

The rule is clearly established in Vermont that breach-of-contract damages must be proved with reasonable certainty.  *Madowitz v. Woods at Killington Owners' Ass'n*, 2014 VT 21, ¶ 14, 196 Vt. 47, 93 A.3d 571.  Breach-of-contract damages therefore cannot be based on mere speculation and conjecture.  *Id.* at ¶ 14, 196 Vt. at 55, 93 A.3d 577.  "An injury based on speculation about uncertain future events is no injury at all."  *Kelly v. Univ. of Vt. Med. Ctr.*, 2022 VT 26, ¶ 32, 216 Vt. 445, 280 A.3d 366 (quoting *Hedges v. Durrance*, 2003 VT 63, ¶ 12, 175 Vt. 588, 834 A.2d 1 (mem.)).  Breach-of-contract damages do not need to be exact or precise, but a

reasonable factfinder must have sufficient evidence from which to make a reasonable determination of damages. *See Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 34, 195 Vt. 524, 90 A.3d 885.

RBI challenges Barton's asserted damages for lost profits and repair costs as speculative. According to RBI, Barton lacks evidence to show whether Barton needs to completely reconstruct the Project, the amount that Project repairs would cost, or the amount of revenue Barton might lose while any needed repairs take place. (*See* Doc. 105 at 12.)

## A. Whether Barton Has Sufficient Evidence of the Amount of Future Damages

RBI contends Barton's breach-of-contract damages cannot be proven with reasonable certainty for two reasons. First, RBI asserts that none of Barton's witnesses can testify to the cost of potential repairs or how much revenue Barton might lose during the repair process. (*See id.* at 9–11.) Second, RBI asserts any repair damages must be speculative because future repairs must be pre-approved by Vermont's ANR, and Barton has not yet secured the necessary approval. (*See id.* at 10–11.)

After reviewing the summary judgment submissions, the court concludes a reasonable jury has sufficient evidence to make a reasonable determination of the cost of potential repairs. Barton introduced a proposal from Norwich Solar Technologies ("Norwich Solar") for frost remediation services itemizing repair costs totaling $1,546,225.00. (*See* Doc. 112-2 at 4–6.) Norwich Solar also estimated the cost of replacement W6x9 steel posts for the frost remediation—which Barton must supply at its own expense—as $350,000 for materials and $50,000 for freight. (*See id.* at 2.) RBI argues these projections are too speculative because the Norwich Solar Proposal is four years old and construction costs may have changed. (*See* Doc. 118 at 5.) A party, however, does not need to produce precise figures of breach-of-contract damages to sustain their claim— approximations or estimates may be enough. *See Waterbury Feed Co. v. O'Neil*, 2006 VT 126,

¶ 27, 181 Vt. 535, 915 A.2d 759; *see also* Restatement (Second) of Contracts § 352 cmt. a. (A.L.I. 1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.").

The fact that Barton has not yet received permits from ANR does not make the amount of Barton's repair damages speculative. RBI likens the steps Barton would need to take to acquire ANR approval to the evidence the Vermont Supreme Court deemed speculative in *Kelly*. (Doc. 118 at 5–6.) This case is distinguishable. *Kelly* did not merely involve a plaintiff whose damages calculations relied on a series of future events that needed to occur—it also contained uncontested evidence that those events were *unlikely* to happen. *See* 2022 VT ¶ 34 ("Even assuming for the sake of argument that plaintiff could have finished the fellowship and obtained his certificate of completion, which is hard to imagine given the uncontested facts, he still needed to pass an exam he had twice failed <u>before</u> he sat for the Sleep Medicine Board Exam." (alteration in original)). Similarly, in *Madowitz*, the Vermont Supreme Court found plaintiff's calculation of lost profits flowing from a frustrated plan to construct condominium units by January 1, 2000 was "entirely speculation" when undisputed record evidence showed plaintiff calculated lost profits based on units constructed after January 1, did not calculate any construction costs for any units constructed before January 1, and only obtained one building permit for a single unit in November 1999. 2014 VT ¶¶ 13, 16–19. The *Madowitz* court concluded "[e]ven if the record supported a finding that [plaintiff] would have commenced or completed some construction, the number of units that could have been constructed [by January 1, 2000] is also entirely speculation." *Id.* ¶ 19. By contrast, RBI has identified no evidence that Barton would not receive permits for the predicted repairs. As a result, RBI has not shown Barton's damages for future repairs are speculative or uncertain.

**B.  Whether Barton Has Sufficient Evidence that the Project Must Be Reconstructed**

RBI asks the Court to preclude Barton as a matter of law from seeking future damages related to the cost of a complete Project reconstruction because Barton's allegation that the Project requires a full reconstruction is "entirely speculative."  (*See* Doc. 105 at 11–12.)  The court disagrees.

RBI has not met its burden of showing there is no evidence that the Project requires a full reconstruction.  RBI contends that "Barton's claim that the entire Project needs to be re-constructed is based upon a 'guess'" because Barton does not have precise measurements of how much the racking posts have moved since installation.  (*See* Doc. 105 at 11.)  RBI does not explain, however, how determining whether the entire Project must be reconstructed depends on knowing exactly how much the posts have moved since installation.  RBI does not appear to dispute the posts have moved since installation.  Indeed, evidence RBI introduced on summary judgment supports the notion that the racking posts have moved.  (*See* Doc. 105-9 at 7, 32:10–21) (testimony of Ian Jewkes that he observed the racking has moved significantly since installation because "frankly[,] when we built the array . . . you had to really stoop to get under the low edge of the panels, and now you don't have to stoop that much.  I mean, it's that simple; it's moved a lot.").

RBI also asks the Court to find that Barton cannot seek future damages related to the cost of a full Project reconstruction because Barton has not disclosed a structural engineering expert to testify a full Project reconstruction is required.  (*See* Doc. 118 at 6–8.)  RBI asserts that Barton's only admissible evidence of the extent of needed repairs comes from Dr. Kelley, who "testified . . . that an as-needed approach could work for any necessary repairs."  (*See* Doc. 118 at 6–7.)

The court declines to consider this argument on summary judgment because RBI raised the argument for the first time in its reply.  A party cannot raise new arguments in support of summary judgment for the first time in a reply because it essentially prevents the nonmoving party from

providing any response. *See, e.g.*, *Vilkhu v. City of New York*, No. 06-CV-2095 (CPS)(JO)., 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008); *Rowley v. City of New York*, No. 00 Civ. 1793(DAB)., 2005 WL 2429514, at *5 (S.D.N.Y. Sep. 30, 2005); *see also Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005); *United States v. Stevens,* 380 F.3d 1021, 1025 (7th Cir. 2004). In its motion for partial summary judgment, RBI did not argue Barton lacked evidence that the Project must be fully reconstructed—instead, it argued Barton lacked evidence of how much the racking posts have moved, the amount a full Project reconstruction would cost, and whether ANR would allow the reconstruction. (*See* Doc. 105 at 5–6.) RBI could have made the Kelley argument in its original motion because it cited the same evidence in its motion that it relied on for the Kelley argument in its reply. (*See* Doc. 105-3.) RBI did not need to raise the Kelley argument to rebut Barton's opposition. Barton's opposition does not address expert testimony on the need for a full Project reconstruction at all. In short, RBI's argument that Barton lacks expert testimony the Project requires a full reconstruction is a new argument raised for the first time in the reply, and the Court will not address it.

RBI has not met its burden of showing that Barton's damages claims are speculative. Summary judgment on Barton's request for future damages is DENIED.

### III. Summary judgment is warranted on Barton's claim for fraudulent inducement (Count VII) because Barton lacks clear and convincing evidence that RBI misrepresented any facts.

The elements of fraudulent inducement are well-established under Vermont law. To state a claim for fraudulent inducement, a plaintiff must allege: (1) misrepresentation of facts, (2) affecting the essence of the transaction, (3) not open to the defrauded party's knowledge, (4) by one with knowledge and a duty to disclose, (5) with the intent to mislead, and (6) detrimental reliance by the defrauded party. *See Lewis v. Cohen*, 603 A.2d 352, 354 (Vt. 1991).

A promise to do something in the future, made with a present intent not to perform, gives rise to an action in fraud. *See, e.g.*, *Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 747 (Vt. 1993); *Silva v. Stevens*, 589 A.2d 852, 857 (Vt. 1991); *Union Bank v. Jones*, 411 A.2d 1338, 1342 (Vt. 1980). Fraud must be extraneous to the contract rather than a fraudulent nonperformance of the contract itself. *Bevins v. King*, 514 A.2d 1044, 1045 (Vt. 1986).

RBI may satisfy its burden by demonstrating that Barton's "evidence is insufficient to establish an essential element" of its claim. *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988). Barton must prove each element at trial by clear and convincing evidence. *See Lewis*, 603 A.2d at 354. When the clear and convincing evidence standard applies at trial, it governs a summary judgment motion as well. *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1262 (S.D.N.Y. 1989). The court must grant summary judgment for RBI if a reasonable jury could not conclude that Barton has shown each of the elements of fraudulent inducement by clear and convincing evidence. *See Anderson*, 477 U.S. at 255–56.

RBI contends it is entitled to summary judgment for three reasons: first, Barton relies exclusively on provisions of the Contract to show misrepresentation of fact; second, Barton cannot identify any specific false representations allegedly made by RBI to induce Barton to enter the Contract; and third, Barton has no evidence RBI knew it could not deliver a racking system that complied with the Contract before signing the agreement. (Doc. 105 at 12–14.)

RBI has not shown that Barton's only evidence of misrepresentation consists of provisions of the Contract. On the contrary, RBI notes Mr. Grant testified that the basis for Barton's fraud claims "includ[ed] representations in the contract"—not that RBI had refrained from making any other representations. (*See id.* at 13.) Mr. Grant testified other representations came from RBI's

printed literature, marketing materials, and verbal statements made throughout the relationship with Barton. (*See* Doc. 105-5 at 13, 102:5–104:1.)

RBI has shown, however, that Barton lacks sufficient evidence of any specific misrepresentations or of RBI's knowledge of any misrepresentations. Barton contends RBI misrepresented to Barton that RBI intended to perform a geotechnical investigation as part of designing the Project. (Doc. 112 at 23–24.) Barton only identifies two pieces of evidence to support this alleged misrepresentation: (1) a May 15, 2014 email from RBI to Mr. Grant stating that "Geotech sampling" was "apparently happening" when RBI would be on site at the Project and that Mr. Slack would speak with Mr. Grant "after the Geotech is done,"[2] (Doc. 112 at 23); (Doc. 112-6 at 4); and (2) RBI's Project Timeline indicates a date of "May 28" for "Geotech Borings, RBI Pull Test," (Doc. 112-7 at 2.)

These documents are not "clear and convincing evidence" that RBI told Barton it would perform a geotechnical investigation. While Barton's evidence suggests a geotechnical investigation would occur on May 28, it provides no basis to conclude that RBI—as opposed to someone else—would perform it. In other words, just because RBI would be present on May 28 while "Geotech sampling" took place does not make it "clear and convincing" that RBI committed to performing it. Similarly, the Project Timeline listing "Geotech Borings, RBI Pull Test" suggests RBI would conduct a pull test but is silent on who is responsible for the "Geotech borings." Drawing all inferences in favor of Barton, the court finds no reasonable jury could conclude by clear and convincing evidence that RBI intentionally misrepresented it would conduct a

---

[2] Barton did not provide the emails in full—each page has a portion of the right side missing and cuts each line of text short. RBI objected to the incomplete emails at the deposition of Mr. Vietas but has not raised a similar objection on summary judgment. (Doc. 112-3 at 14, 47:16–21.)

geotechnical investigation of the Project. Summary judgment on Count VII (fraudulent inducement) is GRANTED.

## IV. Summary judgment is warranted on Barton's claim for fraudulent concealment (Count VIII) because Barton lacks clear and convincing evidence that RBI concealed its intention to forego a geotechnical investigation.

Under Vermont law, fraudulent misrepresentation can be accomplished by false statement or by the concealment of facts by one who has a duty to disclose those facts. *Est. of Alden v. Dee*, 2011 VT 64, ¶ 32, 190 Vt. 401, 35 A.3d 950. When concealment or silence functions as the "misrepresentation" in the fraudulent transaction, Vermont calls the resulting tort "fraudulent concealment." *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 13 Reporter's Note cmt. a (A.L.I. 2020).

RBI offers two grounds for summary judgment on Barton's fraudulent concealment claim. RBI first contends the Contract leaves geotechnical exploration to RBI's discretion. (*See* Doc. 118 at 8.) Second, RBI maintains that Barton lacks evidence of fraud because Barton's only evidence of concealment does not show fraud by clear and convincing evidence. (*See id.* at 8–9.) According to RBI, emails before and after the May 15 email demonstrate that Barton knew RBI planned to conduct a push/pull test on the posts, not a full geotechnical analysis. (*See id.*) In other words, RBI could not have concealed its intention regarding the geotechnical analysis because Barton knew from other emails in the chain that RBI planned to conduct push/pull testing instead. (*See id.*).

The court finds a reasonable jury could interpret the Contract to require RBI to conduct geotechnical analysis for the Project. The Contract provides that all racking posts at the Project would be embedded to a minimum of seven feet and the embedment "may be deeper based on geotechnical analysis and the discretion of [RBI] as needed for structural integrity." (Doc. 105-4 at 11, ¶ 2(b)(i)). A reasonable jury could understand this phrase to mean that either geotechnical

analysis or RBI's discretion could justify deeper embedment than seven feet. Put another way, the results of a geotechnical analysis could require embedding the posts deeper than seven feet, or RBI could exercise its discretion to make the same decision based on other considerations. The plain language of the Contract does not require a reasonable jury to conclude that the need for a geotechnical analysis falls under RBI's discretion. For this reason, RBI has not shown entitlement to summary judgment on the grounds that Barton's fraud claims are based on an alleged contract breach that did not occur. (*See* Doc. 118 at 8.)

RBI's remaining argument—that Barton cannot show that RBI never intended to perform a geotechnical investigation and concealed this from Barton—does warrant summary judgment for the same reasons discussed in the previous section. Apart from the contract provisions discussed above, Barton lacks clear and convincing evidence that RBI concealed its intention not to perform a geotechnical investigation. *See Bevins*, 514 A.2d at 1045 (holding that fraud must be extraneous to the contract rather than a fraudulent nonperformance of the contract itself). Barton has identified no evidence outside the contract to support its belief that RBI would perform a geotechnical investigation. Put another way, Barton cannot show that RBI's intention to perform a pull test instead of geotechnical investigation was "not open to [Barton's] knowledge" because Barton does not have clear and convincing evidence that RBI would perform a geotechnical investigation. *See Lewis*, 603 A.2d at 354. Summary judgment on Count VIII (fraudulent concealment) is GRANTED.

**Conclusion**

For the reasons above, RBI's motion for partial summary judgment (Doc. 105) is GRANTED as to Counts III and IV and DENIED as to Count II and Barton's request for future damages.

DATED in the District of Vermont, this 30th day of September 2025.

Mary Kay Lanthier
United States District Judge